■ In the Matter of THEODORE R. ZALE, Appellant, v. BOARD OF ZONING AND APPEALS OF THE TOWN OF NORTH HEMPSTEAD, Respondent.— In a proceeding pursuant to article 78 of the CPLR to review respondent's determination, rendered September 6, 1972, denying appellant's application for a zoning variance to permit construction of an office building in a Business A district, the appeal is from a judgment of the Supreme Court, Nassau County, entered February 23, 1973, which dismissed the petition. Judgment affirmed, without costs, on the opinion at Special Term. Martuscello, Acting P. J., Latham, and Brennan, JJ., concur; Gulotta, J., concurs in the result, with the following memorandum: I concur, but only on the limited ground that petitioner was not entitled to a variance from the parking requirements on the showing made. I think the proposed building does not violate the height limitations and that it was erroneous to judge its height from Water Mill Lane (also known as Cutter Mill Road), a street 37 feet below the grade of Great Neck Road on which the building would stand. I likewise disagree with the proposition that the normal business traffic which would be generated by utilizing a permitted business use is a factor to be considered to petitioner's detriment in deciding the application. I do not agree that petitioner should be denied relief from the unique hardship which this building site suffers because he bought it knowing of the condition. That is not the meaning of self-imposed hardship, or more accurately speaking self-imposed practical difficulty, since this is not a use variance case. That term refers to a situation created by an applicant (*Matter of Clark* v. *Board of Zoning Appeals of Town of Hempstead,* 301 N. Y. 86; *Matter of Henry Steers, Inc.* v. *Rembaugh,* 259 App. Div. 908, affd. 284 N. Y. 621; *Matter of Hoffman* v. *Harris,* 17 N Y 2d 138) and not to a simple change in ownership of a plot which already suffers from a hardship. Nor do I agree that petitioner will violate the percentage of building occupancy requirements by the proposed tiered parking which is below the grade of the main plot. If, *arguendo,* we were to regard as a building any construction which merely brings a plot up to grade, I believe petitioner would be entitled to relief because of the unique situation presented by the unusual terrain. This is all one structure. Certainly the ordinance cannot reasonably be construed to limit petitioner to one story on Great Neck Road because Water Mill Lane is 37 feet below it. The only valid reason for denying the application, in my opinion, was petitioner's failure to comply with the off-street parking requirements. No case was made out for the drastic reduction from 371 to 224 parking spaces. Petitioner has put the cart before the horse in attempting

to capitalize his purchase price of $318,000. The uniform parking requirement of one car for each 100 square feet of office space was in effect three years prior to his election to pay this price for the property. He was not warranted in making an investment which mandated a parking variance to make it economically viable and then seek to rely on *Matter of Fulling* v. *Palumbo* (21 N Y 2d 30). By a parity of reasoning he could ignore the height, setback and every other requirement by paying a still more exorbitant price for the property. Actually, reasonable price determination should yield to the parking restrictions rather than the other way around. Conceivably, parking restrictions could be made so onerous and unreasonable that they would bear no reasonable relationship to legitimate zoning considerations, but then it would not be a matter of granting a variance for a single plot but an attack on the ordinance itself. In any event, no such showing has been made in this case. The solution for petitioner's problem lies in reducing the rentable space to conform to the parking he is able to provide, unless indeed he is able to show that the parking ordinance itself is irrational as applied to the whole business section of the village. This cannot be done in an article 78 proceeding, but in a plenary action. Benjamin, J., dissents and votes to reverse the judgment to annul respondent's determination and to direct that the variance application be granted, with the following memorandum: We are again faced with the ever-conflicting problems springing from applications for variances for land use flowing from baroque topographical conditions. Our courts have repeatedly said that determinations of local boards vested with the primary responsibilities in these matters are entitled to great weight and must not be disturbed if there are reasonable bases for the determinations. Nevertheless, we are concerned with the constitutional question of possible deprivation of property without just compensation and, therefore, we cannot attach to the determinations of the primary boards a full measure of illimitable power. While, of course, property is subject to reasonable regulations with respect to its use, the very existence of the provisions for variances and for the review of the granting or denial of variances underscores the obligations of the courts charged with the reviewing responsibility to carefully balance the equities so as not to deny relief where conditions, as here, create great hardship, unless the countervailing equities of the public with respect to health, welfare or security so mandate. In view of these fundamental principles, cases will, of course, be found where local boards have been sustained and other cases where they have been overruled and so we must carefully look to the facts of each case to determine whether the constitutional mandates against unjust deprivation of property have been respected. Examining the record in this case, it appears to me to have been demonstrated beyond question that the variances sought here should have been granted. Further examination of the record makes it clear that the board denying them was probably motivated by the protests within the community which, upon examination, appear in the main related to the question as to whether an office building should be built at all upon this property — a use for which it is zoned. The primary question of technical noncompliance with the required percentage of the area built upon and the primary objection, to wit: failure to meet the requirements for off-street parking, would appear to have been subordinate to the clamor for the *status quo*. The area has been zoned for office buildings. It is presently substandard in a community of high standards. There are many nondescript structures in the immediate area, the removal of which would do much to improve the general quality of the esthetics of a splendidly planned and developed community, the Village of Great Neck. The premises are unique in that there is a drop of more than

30 feet from the front of the lot to the rear. The proposed structure fully conforms at the front of the lot with height requirements. It will have merely three stories of usable office space, a total of approximately 45,000 square feet but with respect to which only 38,120 square feet will be occupied by tenants, the rest being for public areas within the building. Obviously, this is a small structure in conformity with existing suburban practices for office buildings much in demand in such growing communities as Great Neck and architecturally enriching the presently substandard immediate area in this fine community. Viewed from the rear, the bottom of the incline, the building of course looms almost double in height but this topographical characteristic in no sense alters the fact that we are dealing with an office building of but three usable floors not exceeding the 40-foot height in the front of the premises. The back of the premises would be utilized under the plans with two additional parking levels and decks, the lowest of which would be 18 feet below the grade of Great Neck Road but approximately 20 feet above the grade of Water Mill Lane at its most westerly edge. The primary objection upon which the denial of the permit has been predicated is a claim of inadequate number of off-street parking spaces. The rules require one unit of parking for every 100 square feet of office space. Whether we deal with 45,640 square feet as a unit requiring 456 such spaces or 38,120 square feet of office space which is the space generating tenancies, the proposed plans which provide for 224 parking units fall short of the legal requirements and it is this shortage which in the main mandated this application for a variance. All of the testimony in this case indicates that the 100 square-foot area requirement is an extraordinarily onerous one which has not been insisted upon in at least 10 office buildings in close proximity to the instant structure. Those buildings, a table of which is set forth on page 7 of exhibit G of respondent's return to the petition, indicates that building permits have been granted for buildings on Northern Boulevard, Cuttermill Road and Great Neck Road running from 208 square feet to as high as 460 square feet as the requirement per unit. Each and every one of these 10 buildings exceeds the instant building in the number of square feet required for each unit. In the instant case, for each 202 square feet applied to the total space within the building a unit has been provided and if we use the actual rentable space as a criterion, the figures indicate that a space has been provided for approximately each 180 feet of usable space. The record shows that in the County Office Building, in the Courthouse, Administration, Social Services, Maintenance, Laboratory and Transportation buildings and as to the offices north of Old Country Road, Mineola, a much more intensively used area, a space for each 350 square feet was recommended by the extensive parking study prepared by the county itself. A similar study with respect to 10 office buildings in the Town of North Hempstead in the vicinity of the property in question indicates that the parking space area ratio ranges from 208 to 160 square feet per parking space. To deny to this relatively small building, which cannot conceivably generate more than average use, a variance to bring it in line with these existing practices, when the extremely baroque topographical characteristics of the property mandate it, is not supportable by any demonstrated public necessity under any of the existing standards. It is suggested that since the present owner acquired the property with knowledge of the conditions he should be denied relief by reason of a self-imposed hardship. He seeks no greater rights than that to which the prior owner would have been entitled. The hardship imposed springs from the area characteristics of the property and not from the fact that the owner has acquired the property; and whoever the owner might be, he would be

entitled to relief from construction conditions not reasonably adaptable to this extraordinary piece of land. While, as I have indicated, each of these cases stands on its own bottom with respect to the particular conditions of the property and the surrounding area and each can be distinguished, it is relevant however to refer to *Matter of Wilcox* v. *Zoning Bd. of Appeals of City of Yonkers* (17 N Y 2d 249), wherein the Court of Appeals held that there was ample proof of practical difficulty where there was an extreme drop from the grade at the front to that in the rear of the premises and where as a result of such drop unusual site preparation and costly foundations were necessary. Although the zoning ordinance only permitted construction of three-story buildings, the court directed that a variance be issued permitting the construction of six stories in the front and nine stories in the rear where there was as much as an 80-foot drop in grade. Special Term, obviously impressed by the circumstance of local community objection, despite its own judgment of possible unfairness to the owner, suggested that alternative methods of construction might be considered. This merely means a reduction of the usable square foot area which would be placed upon the premises. Since we are dealing merely with three floors and a claimed overrun of approximately 50% in off-street parking units, this suggestion would mean that the building should be limited to one and one-half stories in height. Such a suggestion is merely another way of denying relief, for constructing so inadequate a building upon so difficult a site as this record indicates is an economic absurdity. We are here dealing with a proposed building which would improve the locality in which it would be situated. It is precisely to achieve improvements of this kind that the zoning ordinance of the community provides for office buildings in this location. I concur fully with the view of Mr. Justice Gulotta in his concurring memorandum, except with respect to the impact of the number of required parking units. In my view, no rational basis exists to deny this permit. The determination below should be reversed and the permit granted.